```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/5/15
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

LightSquared Inc., et al.                            :
                                                     :
                              Plaintiffs,            :
                                                     :        13 Civ. 8157 (RMB)
                                                     :        Adversary Proceeding No. 13-1670
             -against-                               :
                                                     :
Deere & Company, et al.                              :
                                                     :
                              Defendants.            :
-------------------------------------------------------------X
                                                     :
Harbinger Capital Partners, LLC, et al.              :
                                                     :
                              Plaintiffs,            :
                                                     :        13 Civ. 5543 (RMB)
             -against-                               :
                                                     :
                                                     :        **DECISION & ORDER**
Deere & Company, et al.                              :
                                                     :
                              Defendants.            :
-------------------------------------------------------------X

## I.   INTRODUCTION

Before the Court is the joint motion of Defendants Deere & Company ("Deere"), Garmin

International, Inc. ("Garmin"), Trimble Navigation Limited ("Trimble"), and The U.S. GPS

Industry Council ("USGIC," and collectively, "Defendants") to dismiss two related actions

brought against them by LightSquared, Inc. ("LightSquared"), a mobile telecommunications

company currently in Chapter 11 proceedings in the United States Bankruptcy Court for the

Southern District of New York ("Bankruptcy Court"), and Harbinger Capital Partners LLC

("Harbinger"), a hedge fund which has invested in LightSquared.

In its Amended Complaint, dated March 18, 2014, LightSquared alleges that between

2001 and 2010 "Defendants repeatedly led LightSquared to believe that . . . [LightSquared's]

nationwide wireless network could coexist with [Defendants'] GPS products" but that, in September 2010, "Defendants reneged on their prior contracts, broke their prior promises, and disavowed their prior representations" by "disclos[ing] that they had designed and manufactured their GPS receivers to 'listen in' on the same spectrum that the [Federal Communications Commission ("FCC")] has licensed to LightSquared (not Defendants)."[1]  (Am. Compl., dated March 18, 2014 ("LS Compl."), ¶¶ 4, 7.)  According to LightSquared, "as a direct and foreseeable result of Defendants' actions, the FCC sought to block the launch of LightSquared's network by suspending its authority for terrestrial operations," which in turn "caused lucrative business contracts with LightSquared to be cancelled, multiple prospective business relationships with LightSquared never to be consummated (or, if consummated, never realized), and forced LightSquared to file for bankruptcy in May 2012."  (LS Compl. at ¶ 11.)  LightSquared asserts state common law claims of promissory estoppel, quantum meruit, breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, negligent misrepresentation, constructive fraud, tortious interference with existing and prospective business relationships, and civil conspiracy.[2]

---

[1] LightSquared's Complaint—but not Harbinger's Complaint—also names The Coalition to Save Our GPS, an unincorporated association, as a defendant.  The Coalition has neither appeared nor been served in this action.  Defendants argue that, as "an informal group," the Coalition lacks the capacity to be sued.  (Mem. of Law in Supp. of Defs.' Mot. to Dismiss, dated May 28, 2014 ("Defs.' Mem."), at 1 n.1.)  Because, among other reasons, LightSquared fails to respond to this argument in its opposition, the Court dismisses LightSquared's claims against the Coalition.  See In re UBS AG Sec. Litig., No. 07 Civ. 11225(RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (a plaintiff who does not respond to a point raised by a defendant on a motion to dismiss "concedes" that point "through silence").

[2] LightSquared's Complaint was originally filed as an adversary proceeding in the Bankruptcy Court on November 1, 2013.  On January 31, 2014, this Court entered an order withdrawing the Bankruptcy Court reference.  (See Decision and Order, dated Jan. 31, 2014.)

Harbinger filed its Third Amended Complaint on March 18, 2014.  Harbinger asserts substantially the same allegations and operative facts as LightSquared.  Harbinger also alleges that it invested "billions of dollars" in LightSquared in March 2010 in reliance upon Defendants' "represent[ations]—sometimes through affirmative misstatements, sometimes through deliberate omissions—that they were not going to raise the objections [to LightSquared's network] they ultimately asserted [to the FCC]."  (Third Am. Compl., dated Mar. 18, 2014 ("Harb. Compl."), ¶¶ 1, 7.)  According to Harbinger, after Defendants disclosed issues of incompatibility of their products with LightSquared's planned network, "numerous lucrative contracts were cancelled and [Harbinger's] company LightSquared descended into bankruptcy in May 2012."  (Id. ¶ 6.) Harbinger asserts federal claims of securities fraud under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Securities and Exchange Commission Rule 10b-5 ("Rule 10b-5"), and Section 20(a) of the Exchange Act; state common law claims of fraud, negligent misrepresentation, constructive fraud, and equitable estoppel, and deceptive business practices in violation of Section 349 of the New York General Business Law.[3]

On May 28, 2014, Defendants filed a joint motion to dismiss the LightSquared and Harbinger Complaints.  (Mem. of Law in Supp. of Defs.' Mot. to Dismiss, dated May 28, 2014 ("Defs.' Mem.").)  With respect to the claims asserted by LightSquared, Defendants argue, among other things, that (1) LightSquared's breach of contract claim should be dismissed because alleged July 17, 2002 and August 13, 2009 letter agreements among the parties plausibly could not and "plainly do not contain the far-reaching promises and forbearances claimed by

---

[3] By letter dated August 7, 2014, Harbinger requested the withdrawal of Count VII of its Complaint, which asserted a breach of contract claim against Defendants.  (See Letter from Gary Elden to Hon. Richard M. Berman, dated Aug. 7, 2014.)  On Defendants' consent, the Court entered an order, dated August 13, 2014, which "grant[ed] Plaintiffs' application to withdraw Count VII of the Third Amended Complaint, without prejudice."  (Order, dated Aug. 13, 2014.)

Plaintiffs" and because LightSquared "fail[s] to identify in detail the substance of any specific promises purportedly made during the negotiations [preceding the letter agreements]"; (2) "LightSquared does not allege, even in conclusory terms, any promise to take or refrain from taking any specific future action, as promissory estoppel requires"; (3) "the quantum meruit and unjust enrichment claims are precluded by LightSquared's claims alleging enforceable contracts"; (4) LightSquared's misrepresentation claims should be dismissed because LightSquared is "[u]nable to allege—much less describe with particularity—a single false statement" and "do[es] not identify any circumstances in 2002 and 2009 putting the GPS Council on notice of LightSquared's plans, let alone any legal basis for a duty to disclose any resulting interference problems"; (5) LightSquared's tortious interference claims should be dismissed because LightSquared "fails to plead facts demonstrating that each Defendant had actual knowledge of [LightSquared's business] relationship[s]"; (6) LightSquared's conspiracy allegations "are entirely conclusory, with no details regarding who, where, or when"; and (7) LightSquared's claims of quantum meruit, breach of contract, breach of implied covenant, and unjust enrichment are barred by the applicable statute(s) of limitations.  (Defs.' Mem. at 10–11, 15, 18, 25, 43, 44–46.)

With respect to the claims asserted by Harbinger, Defendants argue, among other things, that (1) Harbinger's federal and state law fraud claims should be dismissed because "Harbinger lacks standing to assert a Rule 10b-5 claim" because "Defendants' alleged omissions affected not Defendants' own securities, but those of a different company"; Harbinger's allegations "run afoul of the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act"; and Harbinger "cannot establish . . . a duty to disclose"; (2) "[S]ection 349 [of the New York General Business Law]  does not apply to securities transactions"; (3) "Harbinger's

equitable estoppel claim . . . fails because there is no such cause of action in Virginia or New York"; and (4) Harbinger's claims of securities fraud, common law fraud, negligent misrepresentation, constructive fraud, and equitable estoppel are barred by the applicable statute(s) of limitations.   (Defs.' Mem. at 24, 33, 35–38, 41, 46–47.)

Defendants also argue that (1) "[t]he Noerr-Pennington doctrine . . . bars Plaintiffs' tort claims" because "LightSquared and Harbinger. . . improperly seek to penalize the Defendants for petitioning the FCC"; and (2) "LightSquared's and Harbinger's claims are also preempted by the Federal Communications Act ("FCA") because the . . . Complaints ask the Court to interpret and determine the basis for the market entry decisions of the FCC."   (Defs.' Mem. at 18, 22.)

On August 4, 2014, LightSquared filed an opposition to Defendants' motion to dismiss. (LightSquared's Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, dated Aug. 4, 2014 ("LS Opp'n.").)  LightSquared argues, among other things, that (1) "the full contracts [presumably among LightSquared and Defendants] are not (and were not intended to be) reflected in the [2002 and 2009] FCC letters," and "[t]he complaint alleges in great detail the . . . the agreements reached . . . [and] the specific promises that defendants made"; (2) "[t]he complaint . . . unequivocally states that defendants promised that 'all relevant issues' concerning knowable sources of interference had been addressed and that future GPS operations would coexist with LightSquared's network"; (3) "LightSquared's quantum meruit and unjust enrichment claims are not precluded by its contract claims at this stage"; (4) "The complaint . . . specifically identifies [Defendants'] misrepresentations" and "LightSquared has also more than adequately alleged that defendants tortiously failed to disclose their faulty receiver design (and thus the potential for GPS receiver overload), despite having an obligation to do so"; (5) "'actual knowledge' is not required" to state a tortious interference claim; and (6) LightSquared's claims are not time-barred

because "[n]one of the contract or quasi-contract claims accrued until September 2010."  (LS Opp'n. at 10, 13, 17, 20, 23, 25.)

On July 29, 2014, Harbinger filed an opposition to Defendants' motion to dismiss. (Harbinger's Resp. to Defs.' Mot. to Dismiss, dated July 29, 2014 ("Harb. Opp'n.").)  Harbinger argues, among other things, that (1) its federal and state law fraud claims should survive because "[n]o case requires the security to be issued by defendants"; and "[u]nder New York law [and Rule 10b-5], Defendants had a duty to disclose though [they were] not in privity with [Harbinger]"; (2) "[t]here is a split in authority over whether Section 349 covers securities transactions"; (3) equitable estoppel "can form the basis of a claim, or it can serve as a defense"; and (4) Harbinger's state and federal law claims were timely filed.  (Harb. Opp'n. at 6, 8, 13, 17, 19, 22–24.)

In their oppositions, LightSquared and Harbinger also argue that (1) the Noerr-Pennington doctrine is inapplicable because all of LightSquared's claims "arise from private communications and conduct between the parties, not from any party's petitioning of the government," and (2) the FCA does not preempt LightSquared's claims because "[n]othing in LightSquared's complaint . . . asks this Court to overrule or second-guess any FCC decision regarding LightSquared's authority to offer [telecommunications] services."  (LS Opp'n. at 5, 8–9; see Harb. Opp'n. at 20–22.)

On September 15, 2014, Defendants filed a reply.  (See Reply Mem. in Supp. of Defs.' Mot. to Dismiss, dated Sep. 15, 2014 ("Defs.' Reply").)  Oral argument was held on January 20, 2014.  (See Hr'g Tr., dated Jan. 20, 2014 ("1/20/14 Tr.").)

**For the reasons stated below, Defendants' motion to dismiss is granted in part and denied in part.[4]**

## II.    BACKGROUND

For the purposes of this motion, the Court accepts the following allegations in the LightSquared and Harbinger Complaints as true.  See, e.g., Aguas Lenders Recovery Grp. LLC v. Suez, S.A., 585 F.3d 696, 697 (2d Cir. 2009).

**LightSquared's FCC-licensed Spectrum**

"Spectrum" consists of the range of electromagnetic radio waves used to carry sound, images, and data information wirelessly.  Information is sent through the spectrum in the form of "signals."  Each signal travels from a "transmitter" to a "receiver."  (LS Compl. ¶ 28.) Transmitters can be physically located on space-based satellites ("satellite transmitter") or on the ground ("terrestrial transmitter").  (Id. ¶ 28.)

In the United States, the FCC and the National Telecommunications and Information Administration ("NTIA") share responsibility for managing spectrum use which is finite.  The NTIA manages spectrum used by the federal government, while the FCC is responsible for spectrum used by private sector companies.  (Harb. Compl. ¶ 36.)  Pursuant to its authority under Section 303(y) of the Communications Act of 1934, the FCC allocates available spectrum to specific private users.  (Id. ¶37)  These allocations are granted (licensed) in sections of contiguous spectrum that are typically referred to as "bands."  (Id. ¶ 38.)

In 1989, the FCC authorized LightSquared (i.e., its predecessor entities) to operate within two non-adjacent (spectrum) bands—i.e., 1525 MHz to 1559 MHz and 1626.5 MHz to 1660.5

---

[4] Any issues raised by the parties not specifically addressed herein were considered by the Court on the merits and rejected.

MHz—which the LightSquared and Harbinger Complaints refer to as the "LightSquared Band." (LS Compl. ¶ 29; see also Ex. 5 to Decl. of William A. Isaacson in Supp. of Defs.' Mot. to Dismiss, dated May 28, 2014, at 15 n. 8.)  Located in between the two portions of the LightSquared Band is the 1559 MHz to 1610 MHz spectrum band, which the LightSquared and Harbinger Complaints refer to as the "GPS Band."  (LS Compl. ¶ 30.)  The GPS Band is utilized by Defendants Deere, Trimble and Garmin, who manufacture receivers of GPS Band signals from a government-owned satellite system.   (Id. ¶¶ 31–32.)

### The 2002 Out-of-band Emissions Issue

Initially, the FCC permitted only satellite transmissions in the LightSquared Band.  (Id. ¶ 29.)  "In the late 1990s, LightSquared began developing plans to build and deploy an integrated satellite and terrestrial network."  (Id.)  In 2001, LightSquared petitioned the FCC to authorize terrestrial operations within the LightSquared Band.  (Id. ¶ 47; Harb. Compl. ¶ 106.)  Defendants lodged objections with the FCC and also expressed concern directly to LightSquared contending that terrestrial operations in the LightSquared Band "could potentially cause interference with GPS products."  (LS Compl. ¶¶ 48, 57; Harb. Compl. ¶ 109.)  Defendants stated to LightSquared that their concern was "out-of-band emissions," i.e., that the radio signals emitted by LightSquared's terrestrial transmitters could "bleed over" into the adjacent GPS Band and negatively impact the functioning of Defendants' GPS receivers.  (LS Compl. ¶¶ 49–50.)  To resolve Defendants' concern, in 2001 and 2002 LightSquared entered into "direct negotiations" with Defendants, both individually and through the USGIC (a trade association whose members include Deere, Garmin, and Trimble and whose conduct is allegedly controlled by those Defendants).  (Id. ¶¶ 19, 51; Harb. Compl. ¶¶ 30–33.)

LightSquared and Harbinger allege, and Defendants do not dispute, that the 2002 negotiations resulted in a "mutual agreement" between LightSquared and Defendants "to protect GPS devices from out-of-band-emissions" ("2002 Agreement").  (Id. ¶ 52; Harb. Compl. ¶ 111; Defs.' Mem. at 5, 10.)  Pursuant to the 2002 Agreement, LightSquared agreed to limit out-of-band emissions from its terrestrial transmitters in exchange for Defendants' promise "to withdraw their pending objections" to LightSquared's 2001 request for FCC authorization of terrestrial operations.  (LS Compl. ¶ 57.)  The 2002 Agreement is alleged by Harbinger to have been reflected in a July 17, 2002 joint letter to the FCC from LightSquared and Defendant USGIC, pursuant to which the parties "agreed on specific out of band emission ('OOBE') limits . . . for the . . . base stations and terminals that [LightSquared] will deploy."  (Harb. Compl. ¶ 111.)  LightSquared, on the other hand, alleges that the July 17, 2002 letter "summarized many, but not all, of the provisions of the 2002 Agreement."  (LS Compl. ¶¶ 53–54.)  According to LightSquared, Defendants also "promised that, given LightSquared's concessions, their own continuing operations would coexist with LightSquared's network" and also "promised that further objections to the FCC would be unwarranted based on LightSquared's operations as authorized in the 2003 ATC Order." [5]   (Id. ¶ 57.)  LightSquared alleges that the 2002 Agreement was "memorialized . . . in writing through an exchange of correspondence" among LightSquared and Defendants, and is "reflected in the terms agreed upon through emails, negotiations, and other communications between Defendants and LightSquared." [6]  (Id. ¶ 158.)

---

[5] The "2003 ATC Order" refers to the order, dated January 29, 2003, issued by the FCC and authorizing terrestrial operations within the LightSquared Band.  (See infra at 10.)

[6] LightSquared's Complaint does not appear specifically to identify any correspondence, emails or communications evidencing the 2002 Agreement apart from the July 17, 2002 letter to the FCC.

The FCC's 2003 ATC Order authorized terrestrial operations within the LightSquared Band, "subject to various rules pertaining to the licensing and operation of those terrestrial services."  (Id. ¶ 59; Harb. Compl. ¶ 113.)  In November 2003, LightSquared applied for the licenses that would allow it to deploy and operate its terrestrial network.  (LS Compl. ¶ 62.)  The USGIC supported LightSquared's November 2003 applications, stating "[w]e believe that [LightSquared] is to be commended for its proposal to use its spectrum in a responsible manner that ensures the continued utility of GPS Receivers."  (Id. ¶ 63.)   In November 2004, the FCC granted LightSquared's license applications, authorizing LightSquared to deploy over 12,000 terrestrial base stations nationwide.  (Id.)  Over the next several years, LightSquared "continued to move toward deployment of its terrestrial network by investing in its network architecture and entering into commercial relationships."  (Id. ¶ 70.)

**The 2009 Out-of-band Emissions Issue**

A (second) issue arose in early 2009 when LightSquared petitioned the FCC to modify the terrestrial component of its spectrum license.  (Id. ¶ 73.)  Among other things, LightSquared sought permission to operate low-power indoor base stations called "femtocells" which are designed to improve network coverage inside buildings.  In response to LightSquared's request, Defendants submitted "comments" to the FCC raising the concern that out-of-band emissions from LightSquared's femtocells "could interfere with [Defendants'] GPS devices."  (Id.)  As they had in 2002, LightSquared and Defendants entered into "direct negotiations" to resolve the out-of-band emissions issue raised by Defendants in 2009.  The negotiations occurred via teleconferences and other communications between LightSquared and representatives of Defendants who were located in Virginia and Washington D.C., respectively.  (Id. ¶¶ 75–77; Harb. Compl. ¶ 153.)

The parties agree that the 2009 negotiations resulted in a second "private agreement" between LightSquared and Defendants pursuant to which LightSquared "voluntarily agreed to restrict the out-of-band emissions of its femtocells" and Defendants agreed "to withdraw their pending FCC objections" to LightSquared's 2009 request ("2009 Agreement").  (LS Compl. ¶¶ 79–80; Harb. Compl. ¶ 154; Defs.' Mem. at 5.)  According to Harbinger, the terms of the 2009 Agreement are reflected in the parties' August 13, 2009 letter to the FCC, which stated that the parties "have agreed on out of band emissions limits for the operation of [femtocells]. . . thereby addressing the concerns expressed by the [USGPSIC] in its comments regarding the ATC Modification Application."  (Harb. Compl. ¶ 156.)  LightSquared alleges that the August 13, 2009 letter "summarized many, but not all, of the key provisions of the 2009 Femtocell Agreement."  (LS Compl. ¶ 79.)  That is, according to LightSquared, Defendants also "promised that, given LightSquared's concessions, their own continuing operations would coexist with LightSquared's network" and "represented that further objections to the FCC would be unwarranted based on LightSquared's operations as authorized by the FCC for LightSquared's 2009 ATC Modification application."    (Id. ¶ 80.)  LightSquared alleges that the 2009 Agreement was "memorialized . . . in writing through an exchange of correspondence" among LightSquared and Defendants, and is "reflected in the terms agreed upon through emails, negotiations, and other communications between Defendants and LightSquared." [7]  (Id. ¶ 166.)

On March 26, 2010, the FCC granted LightSquared's modification request.  (Id. ¶ 82.)

---

[7] LightSquared's Complaint does not appear specifically to identify any such correspondence, emails, or other communications apart from the August 13, 2009 letter to the FCC.

**Harbinger's Investment in LightSquared**

Harbinger made its first investment in LightSquared on December 23, 2004 by purchasing 2,052,495 shares of LightSquared for a total cost of $28,360,292.  (Harb. Compl. ¶ 131.)  Over the next several years, Harbinger made additional investments in LightSquared and, by 2009, Harbinger had become LightSquared's single largest shareholder and creditor.  (Id. ¶¶ 132–34.)

On March 26, 2009, Harbinger applied to the FCC for permission to acquire 100% ownership of LightSquared, (id. ¶ 142), and, in an order dated March 26, 2010 ("March 2010 Order"), the FCC approved Harbinger's application.  The FCC's March 2010 Order was conditioned upon LightSquared "actually moving forward with its plan . . . to build a terrestrial network" and included a build-out schedule which required LightSquared "to construct a terrestrial network to provide coverage to at least 100 million people in the United States by December 31, 2012; to at least 145 million people in the United States by December 31, 2013, and to at least 260 million people in the United States by December 31, 2015."  (Harb. Compl. ¶ 161; see also LS Compl. ¶¶ 83–84.)  The Defendants made no objection or comment to the FCC's March 2010 Order.  (Harb. Compl. ¶ 162; LS Compl. ¶ 85.)  According to LightSquared, the March 2010 Order constituted the FCC's "final stamp of approval to LightSquared's terrestrial network."  (LS Compl. ¶ 85.)

"With the FCC's approval, and with none of the Defendants raising objections, Harbinger proceeded to acquire (by merger) all outstanding shares of [LightSquared] on March 29, 2010" for a total cost of "almost $1.9 billion."  (Harb. Compl. ¶ 165.)  And, LightSquared "signed dozens of agreements with partners, retailers, and regional service providers to provide its 4G LTE and satellite services on a wholesale basis."  (LS Compl. ¶¶ 88–93.)  According to

LightSquared, since 2003, LightSquared has spent approximately $4 billion in the development of its network.  (LS Compl. ¶ 137.)

**The Out-of-band Reception Issue**

On September 15, 2010, Defendants disclosed "for the first time" a problem called "out-of-band reception."[8]  (LS ¶¶ 97–98; Harb. Compl. ¶ 170.)   Out-of-band reception occurs when "a receiver [Defendants' GPS receivers in this case] is not limited to receiving signals from within its own band but, instead, is designed to receive signals from neighboring bands."[9]  (LS Compl. ¶¶ 98–99; Harb. Compl. ¶¶ 87–89.)  Defendants apprised the FCC of this out-of-band reception issue sometime in late 2010 in their objection to LightSquared's application for a "handset waiver," which, according to Harbinger and LightSquared, did not involve any change in the technical parameters of LightSquared's planned network.  (LS Compl. ¶ 118.)  The concern expressed by Defendants to the FCC in late 2010 was that "LightSquared's authorized use of its own licensed spectrum could potentially cause Defendants' GPS products to malfunction" and would "render inoperable hundreds of millions of GPS devices."   (LS Compl. ¶ 7; Harb. Compl. ¶ 99.)   LightSquared and Harbinger allege that "[i]n February 2012, as a direct and foreseeable result of Defendants' [disclosure of the out-of-band reception issue], the FCC sought to block the launch of LightSquared's network by suspending its authority for terrestrial operations."  (LS Compl. ¶ 11.)

---

[8] LightSquared's Complaint does not specifically describe the circumstances of this disclosure. Harbinger's Complaint alleges that Defendants "provided the [disclosure] in a proceeding that did not involve LightSquared or Harbinger" which "the FCC had commenced to consider general expansion of terrestrial use in the MSS band."  (Harb. Compl. ¶ 171.)

[9] By contrast, the out-of-band emissions issue raised by Defendants in 2002 and 2009 involved LightSquared's transmission of a signal outside LightSquared's assigned band.  (LS Compl. ¶¶ 98–99; Harb. Compl. ¶¶ 87–89.)

According to LightSquared and Harbinger, Defendants "have, for many years, designed and manufactured GPS receivers capable of receiving transmissions not only from frequencies in the GPS Band (i.e., the only frequencies actually allocated to GPS operations), but also from frequencies outside the GPS Band, including frequencies in the LightSquared Band that the FCC specifically assigned to LightSquared." (LS Compl. ¶ 102; Harb. Compl. ¶ 93.)  They assert that "Defendants knew about the potential [out-of-band reception] problem before September 2010 [allegedly since at least 2003]" and "could and should have raised and addressed their concerns long before September 2010." (LS Compl. ¶¶ 10, 112, 116.)  On August 22, 2011, Deere allegedly "admitted" in a letter, dated August 22, 2011, that Defendants knew "from the beginning" that out-of-band reception was a concern.  (Id. ¶ 112.)  Moreover, according to LightSquared and Harbinger, "Defendants consider the operational parameters of their receivers proprietary and confidential," and, therefore, "[Defendants] remained the sole parties capable of identifying and raising the [out-of-band reception] issue." (LS Compl. ¶ 105; Harb. Compl. ¶ 205.)  LightSquared and Harbinger allege that Defendants' failure to disclose the out-of-band reception issue, and Defendants' alleged "misrepresentations and omissions to LightSquared" during the negotiations between the parties in 2002 and 2009, "led LightSquared to believe that all [interference] concerns had been resolved and that Defendants had no further objections to the LightSquared network." (LS Compl. ¶¶ 135–36; see Harb. Compl. ¶ 7.)

In January 2011, the FCC ordered the creation of a working group, including representatives of LightSquared and Defendants, to address the 2010 interference issues raised by Defendants.  (Id. ¶ 119.)  Defendants, according to LightSquared and Harbinger, "refused . . . to work in good faith with LightSquared toward [a] solution." (Id. ¶ 127.)  On February 14, 2012, the FCC received a letter from the NTIA stating that "LightSquared's proposed mobile

broadband network will impact GPS services" and "there appears to be no practical solutions or

mitigations that would permit the LightSquared broadband service, as proposed, to operate . . .

without significantly interfering with GPS" and "without impacting to some degree safety-

critical GPS functionality." (<u>See</u> Ex. 8 to Decl. of William A. Isaacson in Supp. of Defs.' Mot. to

Dismiss, dated May 28, 2014.)  On February 15, 2012, the FCC proposed to "suspend

indefinitely" LightSquared's authorization to operate a terrestrial network "**due to**

**LightSquared's inability to address satisfactorily the legitimate interference concerns**

**surrounding its planned terrestrial operations**."  (Public Notice, dated February 15, 2012,

FCC Docket No. 11-109 (emphasis added); LS Compl. ¶ 139; Harb. Compl. ¶ 204.)  In so doing,

the FCC allegedly prevented LightSquared from executing and operating its planned terrestrial

network and, as a result, "caused lucrative business contracts with LightSquared to be cancelled,

multiple prospective business relationships with LightSquared never to be consummated (or, if

consummated, never realized), and forced LightSquared to file for bankruptcy in May 2012."

(LS Compl. ¶ 11.)  Harbinger alleges that it lost "at least $1.9 billion dollars" that it had invested

in LightSquared.  (Harb. Compl. ¶¶ 222, 250.)

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556

U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  <u>Iqbal</u>, 556 U.S. at 678.  "[W]here the well-pleaded facts do not

permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged—but it has not shown—that the pleader is entitled to relief."  Id. at 678–679 (internal

punctuation omitted); see also Fed. R. Civ. P. 8(a)(2).

Federal Rule of Civil Procedure 9(b) requires that allegations of fraud be "state[d] with

particularity."  Fed. R. Civ. P. 9(b).  To satisfy this requirement the plaintiff must "(1) specify

the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent."

Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted).

## IV.    ANALYSIS

### Choice of Law

The parties dispute which body of state law should be applied to LightSquared and

Harbinger's tort and contract claims.  Defendants argue that "the relevant contacts point to

Virginia," (Defs.' Mem. at 9); LightSquared argues that "[t]he District of Columbia has the most

significant contacts with this case" (LS Opp'n. at 5); and Harbinger argues that "New York law

governs."  (Harb. Opp'n. at 7.)

A federal court sitting in diversity jurisdiction applies the choice of law rules of the

forum state, in this case New York.  Forest Park Pictures v. Universal Television Network, Inc.,

683 F.3d 424, 433 (2d Cir. 2012).   Under New York law, a choice of law analysis is only

required where an actual conflict exists between alternative laws, and "[i]n the absence of

substantive difference . . . a New York court will dispense with choice of law analysis."  Int'l

Bus. Mach. Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004).

The parties do not identify any meaningful differences among the laws of New York, the

District of Columbia, and Virginia with respect to the resolution of LightSquared and

Harbinger's claims.  (See Defs.' Mem. at 9 ("As to all issues, application of Virginia or even

New York law produces the same result and, therefore, there is no need to decide any choice-of-law issue."); LS Opp'n. at 5 ("[T]his Court need not resolve choice-of-law issues because neither Virginia nor D.C. law supports dismissal."); Harb. Opp'n. at 8 ("In all events, Defendants do not show how D.C. law differs from New York law on duty to disclose, a showing prerequisite to requiring a choice-of-law analysis.").)

The Court perceives no meaningful difference among the relevant state laws. Accordingly, "there need not be a determination of which law to apply because the application of either jurisdiction's law would provide the same result." Asesores y Consejeros Aconsec CIA, S.A. v. Global Emerging Mkts. N. Am., Inc., 841 F. Supp. 2d 762, 766 (S.D.N.Y. 2012).[10]

Assuming, arguendo, that there were a conflict between the laws of Virginia and the laws of the District of Columbia, the Court would be unable (at the motion to dismiss stage) conclusively to determine which state's law applies to LightSquared's fraud claims, given the "fact-intensive" nature of New York's choice of law analysis and the lack of a developed factual record. See Smith v. Railworks Corp., No. 10 Civ. 3980(NRB), 2011 WL 2016293, at *6 n.12 (S.D.N.Y. May 17, 2011) ("Because a choice of law analysis is fact intensive, courts often decline to make a choice of law determination at the motion to dismiss stage.").

**LightSquared's Claims**

_____

[10] Defendants argue that LightSquared's claim of constructive fraud must be dismissed because "constructive fraud cannot, as a matter of Virginia law, be premised on a fraudulent omission." (Defs.' Reply at 12.) But the Supreme Court of Virginia's has concluded that "concealment can give rise to constructive fraud . . . in cases where there is a duty to disclose the concealed fact." Cohn v. Knowledge Connections, Inc., 266 Va. 362, 367 n.2 (2003); see also Noell Crane Sys. GmbH v. Noell Crane and Serv., Inc., 677 F. Supp. 2d 852, 871 (E.D. Va. 2009) ("Concealment may constitute constructive fraud where a party lacks the intent to conceal a material fact, but the party had a duty to disclose information and its failure to disclose causes damage to one reasonably relying upon that omission.").

**(1)**      **Alleged Breach of Contract and Implied Covenant**

Defendants argue persuasively that LightSquared's claims for breach of contract and breach of the implied covenant of good faith and fair dealing should be dismissed because the 2002 and 2009 Agreements "plainly do not contain the far-reaching promises and forbearances claimed by Plaintiffs" and because LightSquared "fail[s] to identify in detail the substance of any specific promises purportedly made during the negotiations." (Defs.' Mem. at 10, 12.) LightSquared responds that "[t]he complaint alleges in great detail the . . . the agreements reached . . . [and] the specific promises that defendants made." (LS Opp'n. at 17.) The Court agrees with Defendants on these issues.

In order to state a claim for breach of contract (under Virginia and District of Columbia law) LightSquared must plausibly allege "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Filak v. George, 267 Va. 612, 619 (2004); Coon v. Wood, No. 13–1400, 2014 WL 4647713, at *4 (D.D.C. Sep. 18, 2014). The agreement "must be sufficiently definite to enable a court to give the contract an exact meaning, and the contract must obligate the contracting parties to matters that are definitely ascertained or ascertainable." Dodge v. Trs. of Randolph–Macon Woman's Coll., 276 Va. 1, 5–6 (2008) ("The terms of the contract must be clear, definite, and explicit" (internal quotation marks omitted)); see also Virtual Def. & Dev. Int'l., Inc. v. Republic of Moldova, 133 F. Supp. 2d 9, 17 (D.D.C. 2001) ("The contract must be sufficiently definite as to its material terms (which include, e.g., subject matter, price, payment terms, quantity, quality, and duration) that the promises and performances to be rendered by each party are reasonably certain." (internal quotation marks omitted)).

As noted, Harbinger has withdrawn its breach of contract claim against Defendants.  (See

supra n. 3.)  As to LightSquared's breach of contract claims, LightSquared and Defendants agree

that they entered into enforceable contracts in 2002 and 2009 but they disagree over the breadth

or scope of those contracts.  According to Defendants (and Harbinger), the terms of the 2002 and

2009 Agreements are (fully) set forth in the parties' July 17, 2002 and August 13, 2009 letters to

the FCC, pursuant to which LightSquared agreed to "out-of-band emissions limits" in exchange

for Defendants' promise to withdraw their (then-existing) FCC objections.  (Defs.' Mem. at 5, 16

("the 2002 and 2009 Letter Agreements are binding, enforceable contracts that govern the

parties' relationship").  While LightSquared agrees that these terms are part of the 2002 and 2009

Agreements, it also contends that the Agreements include two additional "promises" made by

Defendants that are not reflected in the parties' letters to the FCC, namely that (1) "given

LightSquared's concessions, [Defendants'] own continuing operations would coexist with

LightSquared's network" and (2) "further objections to the FCC [by Defendants and based upon

LightSquared's network] would be unwarranted."  (LS Compl. ¶¶ 57, 80.)

The Court concludes that the above two additional "promises" by Defendants are not

"sufficiently definite" or concrete as plausibly to be binding upon Defendants.  Mero v. City

Segway Tours of Washington DC, LLC, 826 F. Supp. 2d 100, 105 (D.D.C. 2011) ("[T]he

contract must be sufficiently definite as to its material terms (which include, for example, subject

matter, price, payment terms, quantity, quality, and duration) that the promises and performances

to be rendered by each party are reasonably certain." (internal quotation marks and citation

omitted)).  The alleged promises are not anywhere stated in the July 17, 2002 and August 13,

2009 letters to the FCC.  Moreover, as presented by LightSquared, the promises are conclusory,

vague and open-ended and say nothing about what specifically Defendants may or may not do.

Among other things, the words "coexist" and "unwarranted" are "so vague and devoid of content that it is impossible for the Court to determine [the promise's] terms or any breach of its terms." James v. Miche Bag Corp., 967 F. Supp. 2d 365, 368 (D.D.C. 2013); see also Mero, 826 F. Supp. 2d at 106 ("Plaintiff does not identify any facts that demonstrate a promise made by defendants to provide any particular training regimen for any particular duration.").  The alleged promises do not include specific obligations and are, therefore, insufficient to support of breach of contract claim.[11]  See Foxworth v. United States, No. 3:10–CV–317, 2010 WL 3938267, at *4–5 (E.D. Va. Oct. 6, 2010) (contractual language providing that defendant would "utilize . . . best efforts to ensure that any future medical treatment . . . will be performed by and at the McGuire Veteran's facility" is a "statement of intent [that] does not rise to the level of legally enforceable obligation").

The conclusory nature and indefinite descriptions of the alleged additional promises are exacerbated by LightSquared's failure to specify the written source(s) of those promises.  The Complaint alleges generally that the promises were "memorialized . . . in writing" and "reflected in the terms agreed upon through emails, negotiations, and other communications," (LS Compl. ¶ 158), but, apart from the July 17, 2002 and August 13, 2009 letters to the FCC (which do not contain the alleged promises), LightSquared fails to identify or pinpoint any of these communications with any particularity (much less attach or quote from them).  It is implausible that such allegedly significant commitments, which purportedly bound Defendants' operations and FCC contact in perpetuity, would be left out of the parties' letters to the FCC.  "[P]laintiff's

---

[11] LightSquared's Complaint also describes the alleged promises as "affirmative representations."  (See LS Compl. ¶ 95 ("LightSquared relied on . . . Defendants' affirmative representations that the LightSquared network could coexist with GPS operations"); id. ¶ 80 ("Defendants . . . represented that further objections to the FCC would be unwarranted.").)

failure to attach, or plead the specific terms of, the claimed [promises] is troubling, particularly in light of the fact that it was allowed to amend its original complaint and specifically added an assertion that the aforementioned [promises] w[ere] 'written.'" Daiei Trading Co., Inc. v. Williams Rice Milling Co., 30 F. App'x. 13, 15 (2d Cir. 2002). Defendants (and the Court) are deprived of "even the basic information they'd need to ascertain what contracts Plaintiffs are talking about, and see what defenses, if any, are appropriate." Wolman v. Catholic Health Sys. of Long Island, Inc., No. 10–CV–1326, 2011 WL 1741905, at *4 (E.D.N.Y. May 5, 2011). (See also 1/20/15 Tr. at 5: 8–12 ("[Defendants' Counsel:] Aside from the fact that that's just inherently implausible that anyone would make such a representation, is the fact that there are no allegations, other than the completely conclusory ones, of any communication in which such promises or representations were ever made.").) Accordingly, LightSquared's breach of contract claim is dismissed.

LightSquared's implied covenant claim also fails.[12] LightSquared argues that Defendants breached the implied covenant of good faith and fair dealing "by failing to inform LightSquared that for many years they had been selling GPS receivers designed to trespass on LightSquared's spectrum." (LS Opp'n. at 19.) Defendants argue that LightSquared "does not allege how Defendants violated the 'spirit' of the 2002 and 2009 [Agreements]." (Defs.' Mem. at 17.)

To state an implied covenant claim (under District of Columbia and Virginia law), LightSquared must allege that Defendants "evade[d] the spirit of the contract, willfully render[ed] imperfect performance, or interfere[d] with performance by the other party." Allworth v. Howard Univ., 890 A.2d 194, 201 (D.C. 2006) (internal quotation marks omitted). The implied covenant of good faith and fair dealing "is not a means to add new terms to the

---

[12] Harbinger does not assert an implied covenant claim in its Complaint.

agreement; it merely requires that the parties behave fairly and reasonably in the performance and enforcement of the contract." C & E Servs., Inc. v. Ashland Inc., 601 F. Supp. 2d 262, 275 (D.D.C. 2009); see also Ward's Equip., Inc. v. New Holland N. Am., 254 Va. 379, 385 (1997) (the implied covenant "cannot be the vehicle for rewriting an unambiguous contract in order to create duties that do not otherwise exist.").

LightSquared alleges unpersuasively that Defendants "violated the spirit of both the 2002 Agreement and the 2009 Femtocell Agreement." (LS Compl. ¶ 174.)  LightSquared's claim is implausible, conclusory, and imprecise.  See Mero, 826 F. Supp. 2d at 107 ("This conclusory allegation, which does not specify how defendants evaded the spirit of the contract, willfully rendered imperfect performance, or interfered with performance by plaintiff, does not suffice to state [an implied covenant] claim under the standard set forth in Twombly and Iqbal.").  The Court has already concluded that Defendants' alleged promises to "coexist" with and not to object to LightSquared's network are unenforceable as a matter of law.  Allowing LightSquared to assert an implied covenant claim based upon these promises would "add new terms" to the 2002 and 2009 Agreements, which LightSquared may not do under District of Columbia and Virginia law.  Ashland, 601 F. Supp. 2d at 275.

**(2)    Promissory Estoppel**

Defendants argue that LightSquared's promissory estoppel claim should be dismissed because "LightSquared does not allege, even in conclusory terms, any promise to take or refrain from taking any specific future action, as promissory estoppel requires."  (Defs.' Mem. at 15.) LightSquared responds that "[t]he complaint . . . unequivocally states that defendants promised that 'all relevant issues' concerning knowable sources of interference had been addressed and that future GPS operations would coexist with LightSquared's network."  (LS Opp'n. at 20.)

To state a claim for promissory estoppel under District of Columbia law, LightSquared must allege the existence of a promise containing "definite terms."[13]  Parnigoni v. St. Columba's Nursery Sch., 681 F. Supp. 2d 1, 26 (D.D.C. 2010) ("While reliance on an indefinite promise is unreasonable, the promisor should expect the promisee to rely on a promise which contains definite terms.").  "[A] promise is an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future, communicated in such a manner to a promisee that he may justly expect performance and may reasonably rely thereon." Choate v. TRW, Inc., 14 F.3d 74, 77 (D.C. Cir. 1994) (internal quotation marks omitted).

Defendants' alleged "promises" that their operations "would coexist" with LightSquared's network and that "further objections [by Defendants] to the FCC would be unwarranted" clearly do not suffice to state a promissory estoppel claim.  These alleged promises are, among other things, indefinite in time and do not express an intention that Defendants would "conduct [themselves] in a specified way."  See Choate, 14 F.3d at 77; see also Odhiambo v. Republic of Kenya, 947 F. Supp. 2d 30, 45 (D.D.C. 2013) (where alleged promise "[a]t most . . . expressed a personal belief that Odhiambo should receive what was owed to him under Kenyan law").  Accordingly, LightSquared's promissory estoppel claim is dismissed.

### (3)   Quantum Meruit and Unjust Enrichment

---

[13] As noted, LightSquared and Defendants disagree over whether District of Columbia law or Virginia law applies.  Because Virginia law does not recognize a claim of promissory estoppel, see Nguyen v. CNA Corp., 44 F.3d 234, 241 (4th Cir.1995) ("Virginia courts have repeatedly refused to adopt the doctrine of promissory estoppel as part of Virginia's common law."), the Court considers this claim under District of Columbia law.

Defendants argue that LightSquared's quantum meruit and unjust enrichment claims "are precluded by LightSquared's claims alleging enforceable contracts." (Defs.' Mem. at 18.) LightSquared counters that "plaintiff may plead quasi-contract claims in the alternative." (LS Opp'n. at 20, 23.)

LightSquared may not assert claims of quantum meruit and unjust enrichment "when there is an express contract that governs the parties' conduct." Plesha v. Ferguson, 725 F. Supp. 2d 106, 112 (D.D.C. 2010); Cannon v. Wells Fargo Bank, N.A., 926 F. Supp. 2d 152, 170 (D.D.C. 2013) ("Unjust enrichment presuppose[s] that an express, enforceable contract is absent, therefore courts generally prohibit litigants from asserting these claims when there is an express contract that governs the parties' conduct." (internal quotation marks omitted)); see also WRH Mortg., Inc. v. S.A.S. Assocs., 214 F.3d 528, 534 (4th Cir. 2000) ("Where a contract governs the relationship of the parties, the equitable remedy of restitution grounded in quasi contract or unjust enrichment does not lie.").

The parties do not appear to dispute the existence of two agreements, i.e., the 2002 and 2009 Agreements, and the fact that they were "memorialized in writing." [14]  (LS Compl. ¶¶ 158, 166.)  It is also undisputed that the 2002 and 2009 Agreements by their terms govern the conduct for which LightSquared seeks compensation in its quantum meruit and unjust enrichment claims, i.e., LightSquared's "commitment . . . to restrict the manner in which it would operate its network."  (Id. ¶ 178.)  While the Federal Rules of Civil Procedure allow LightSquared to plead claims in the alternative, "those claims must have some basis on which relief could be granted or

---

[14] LightSquared alleges that the July 17, 2002 and August 13, 2009 letters to the FCC "summarized many, but not all, of the provisions of the 2002 [and 2009] Agreements," (LS Compl. ¶¶ 53–54), and that both Agreements were "memorialized . . . in writing through an exchange of correspondence" among LightSquared and Defendants.  (Id. ¶ 158.)

they will be vulnerable to a motion to dismiss under Rule 12(b)(6)."  United States v. Kellogg Brown & Root Servs., Inc., 800 F. Supp. 2d 143, 160 (D.D.C. 2011).  In other words, LightSquared's unjust enrichment and quantum meruit claims "must be supported by, at the very least, an allegation that there is no valid contract."  Id.  That is not LightSquared's position. LightSquared's Complaint contains allegations that the 2002 and 2009 Agreements are "valid, enforceable contracts between LightSquared and Defendants."  (See LS Compl. ¶ 172.)  See AdiPar Ltd. v. PLD Int'l. Corp., No. 01 Civ. 0765(MBM), 2002 WL 31740622, at *12 (S.D.N.Y. Dec. 6, 2002) ("[T]here is no dispute here over whether the contract governs the supply relationship between AdiPar and PLD.").  Accordingly, LightSquared's quantum meruit and unjust enrichment claims are dismissed.[15]

### (4)  Negligent Misrepresentation and Constructive Fraud

LightSquared alleges that, between 2001 and 2010, Defendants "made numerous affirmative misrepresentations and omissions to LightSquared," which "le[d] LightSquared to believe that it had actually resolved any problems related to GPS and that, as a result, GPS operations would not delay FCC approval of LightSquared's network."  (LS Compl. ¶ 133.)  In their motion to dismiss, Defendants argue that LightSquared's negligent misrepresentation and constructive fraud claims should be dismissed because LightSquared is "[u]nable to allege— much less describe with particularity—a single false statement" and "do[es] not identify any circumstances in 2002 and 2009 putting the GPS Council on notice of LightSquared's plans, let

---

[15] Because the Court concludes that LightSquared's contract and quasi-contract claims should be dismissed for failure to state a claim, it need not address Defendants' argument that these claims should be dismissed on statute of limitations grounds.  Dattner v. Conagra Foods, Inc., No. 01 Civ. 11297(RCC), 2003 WL 1740448, at *6 (S.D.N.Y. Apr. 2, 2003) ("Because the Court finds that this case should be dismissed on forum non conveniens grounds, it need not address Defendants' statute of limitations claims . . . .").

alone any legal basis for a duty to disclose any resulting interference problems." (Defs.' Mem. at 25.) In response, LightSquared argues that "[t]he complaint . . . specifically identifies [Defendants'] misrepresentations" and "has also more than adequately alleged that defendants tortiously failed to disclose their faulty receiver design (and thus the potential for GPS receiver overload), despite having an obligation to do so." (LS Opp'n. at 10, 13.)

To state a claim of negligent misrepresentation, LightSquared must allege that Defendants "(1) made a false statement or omission of fact involving a material issue; (2) the statement or omission was in violation of a duty to exercise reasonable care; (3) the plaintiff reasonably relied to his detriment on the false information; and (4) the defendant[s'] conduct was the proximate cause of plaintiff's injury."[16] Cordoba Initiative Corp. v. Deak, 900 F. Supp. 2d 42, 49 (D.D.C. 2012).

LightSquared must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). See CAC Grp., Inc. v. Maxim Grp., LLC, No. 12 Civ. 5901(KBF), 2012 WL 4857518, at *5 (S.D.N.Y. Oct. 10, 2012), aff'd, 523 F. App'x. 802 (2d Cir. 2013) ("Federal courts considering claims for negligent misrepresentation under both New York and California laws require such claims be plead with particularity under Rule 9(b)"); Maalouf v. Salomon Smith Barney, Inc., No. 02 Civ. 4770(SAS), 2003 WL 1858153, at *4 (S.D.N.Y. Apr. 10, 2003) ("Negligent misrepresentation is a type of fraud and, as such, is subject to Rule 9(b)'s heightened

---

[16] Although Virginia law does not recognize an independent tort of negligent misrepresentation, the elements of constructive fraud under Virginia law are identical to those of a negligent misrepresentation claim under District of Columbia law. See Richmond Metro. Auth. v. McDevitt St. Bovis, Inc., 256 Va. 553, 559 (1998) ("The essence of constructive fraud is negligent misrepresentation."); Noell, 677 F. Supp. 2d at 871 ("Concealment may constitute constructive fraud where a party lacks the intent to conceal a material fact, but the party had a duty to disclose information and its failure to disclose causes damage to one reasonably relying upon that omission."). Accordingly, the Court analyzes LightSquared's negligent misrepresentation and constructive fraud claim as one cause of action.

pleading standard."); <u>Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.</u>, 837 F. Supp. 2d 162, 201 (S.D.N.Y. 2011) ("Regardless of whether this claim is styled as a fraudulent concealment or a negligent omission, it is subject to the heightened pleading standards of Rule 9(b)."). This means that LightSquared must "allege the time, place, speaker and sometimes even the content of the alleged misrepresentation." <u>Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.</u>, 404 F.3d 566, 579 (2d Cir. 2005) (quoting <u>IUE AFL–CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1057 (2d Cir. 1993)). Where the alleged fraud consists of an omission (rather than an affirmative misrepresentation), Rule 9(b) requires that a plaintiff allege "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." <u>Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.</u>, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000).

With respect to LightSquared's negligent misrepresentation claim based upon Defendants' alleged "false statements" (as opposed to "omissions"), the Court concludes that LightSquared has failed to meet the heightened pleading standard of Rule 9(b). LightSquared alleges that "Defendants made representations that the LightSquared network could coexist with GPS" and that "further objections would be unwarranted," but does not identify which speaker made these statements or the specific time and place at which the statements were made. <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"); <u>Luce v. Edelstein</u>, 802 F.2d 49, 54 (2d Cir. 1986) (allegations "which fail to specify the time, place, speaker . . . lack the 'particulars' required by Rule 9(b).").

LightSquared also alleges that Defendants made several statements to the FCC commending LightSquared and "urg[ing]" the FCC to grant LightSquared's various applications, suggesting that such statements were misrepresentations.  (See e.g., LS Compl. ¶ 63 ("We believe that [LightSquared] is to be commended for its proposal to use its spectrum, in a responsible manner that ensures the continued utility of GPS Receivers . . . .").)  These statements, even if they were found to be false, would not be the basis for Defendants' liability because the Noerr-Pennington doctrine "bar[s] liability in state common law tort claims, including negligence . . . for statements made in the course of petitioning the government." Tuosto v. Philip Morris USA Inc., No. 05 Civ. 9384, 2007 WL 2398507, at *5 (S.D.N.Y. Aug. 21, 2007) ("The allegedly false and fraudulent statements made by PM USA in the course of petitioning Congress . . . are shielded by the Noerr–Pennington doctrine.").[17]

LightSquared has stated a claim of negligent misrepresentation on the basis of Defendants' alleged omissions of fact.[18]  LightSquared has identified an alleged omission of fact involving a material issue, namely "Defendants fail[ure] to disclose that they had designed their receivers to 'listen in' on LightSquared's spectrum and that they were therefore subject to potential overload."  (LS Compl. ¶ 136.)  See Ashland, 498 F. Supp. 2d at 258 ("[A] representation is material if it reasonably influences a plaintiff to take an action he or she may have refrained from taking if aware of the actual facts.").

---

[17] LightSquared, in its opposition, also appears explicitly to disclaim any reliance upon Defendants' statements to the FCC.  (LS Opp'n. at 6 ("LightSquared's claims, in contrast, are premised entirely on statements, representations, and omissions made to LightSquared during private negotiations about private issues . . . .").)

[18] The Court is not here ruling upon the ultimate merits of LightSquared's negligent misrepresentation and constructive fraud claims.

LightSquared has also alleged that Defendants' failure to disclose "was in violation of a duty to exercise reasonable care." Cordoba Initiative Corp., 900 F. Supp. 2d at 49.  Although a duty to disclose arises most frequently in the context of a fiduciary relationship, the duty may also arise where "there is some special relationship or contact between the parties," Jefferson v. Collins, 905 F. Supp. 2d 269, 287 (D.D.C. 2012), where Defendants "would be expected to speak." Remeikis v. Boss & Phelps, Inc., 419 A.2d 986, 990 (D.C. 1980).  A party may be expected to speak where it "undertakes to make a statement in a business transaction" but makes only a "partial disclosure," Jefferson, 905 F. Supp. 2d at 287; Ehrlich v. Real Estate Comm'n, 118 A.2d 801, 802 (D.C. 1955), or where "the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist." Bank of Montreal v. Signet Bank, 193 F.3d 818, 829 (4th Cir. 1999); see also Cadet v. Draper & Goldberg, PLLC, No. 05-2105, 2007 WL 2893418, at *6 (D.D.C. Sep. 28, 2007) ("a duty to speak" may arise "where a material fact or defect is unobservable or undiscoverable by an ordinarily prudent person upon reasonable inspection" (internal quotation marks omitted)).  According to LightSquared, Defendants had a duty to disclose the out-of-band **reception** issue to LightSquared prior to 2010 on the basis of Defendants "partial disclosure" of the out-of-band **emissions** issue and their "superior knowledge" regarding out-of-band reception.

The Court concludes that LightSquared has plausibly alleged that a "special relationship" existed with Defendants, and that Defendants may have been expected to disclose the out-of-band reception issue.  First, LightSquared has pled a "partial disclosure" by alleging that (1) Defendants knew about the out-of-band reception issue "as early as 2003" (LS Compl. ¶¶ 10, 109); (2) in 2009, LightSquared made a "modification" request to the FCC which, among other things, requested "authorization [for LightSquared] to operate its terrestrial base stations at

higher power levels . . ." (id. ¶ 73); and (3) during the 2009 negotiations between LightSquared

and Defendants, "[t]he only issue Defendants raised with respect to LightSquared's modification

request was the possibility that out-of-band emissions from LightSquared's 'femtocells' could

interfere with GPS devices."  (Id. ¶ 78.)  It is plausible that, during the 2009 negotiations,

Defendants made representations that the only known source of interference to LightSquared's

planned terrestrial network was out-of-band emissions, but failed to disclose another known

source of interference, i.e., out-of-band reception.[19]  Discovery on these issues is required.

   Defendants counter that "the 2009 femtocell negotiations did not concern high-power

transmissions" and, therefore, Defendants' statements during those negotiations would not have

been "relevant" to the out-of-band reception issue.  (Defs.' Reply at 11, 13.)  It is a question of

fact (requiring discovery) whether the 2009 negotiations involved only discussion of the

femtocell issue, and whether the out-of-band reception issue was relevant to or a part of such

discussions.  The Complaint's allegations raise a plausible claim—to be fleshed out in

discovery—that the 2009 negotiations involved statements by Defendants regarding their

concerns over LightSquared's planned network broadly defined.  See Bank of Montreal, 193

F.3d at 829  ("[A] jury could have found that Signet represented to BMO that it had an

affirmative belief that Reiners was authorized to act for Philip Morris.  Such a partial disclosure

---

[19] LightSquared cannot establish a duty to disclose the out-of-band reception issue based upon
the parties' 2002 negotiations because, as LightSquared acknowledges in its opposition, the out-
of-band reception issue became known to Defendants after the 2002 negotiations had ended.  (LS
Opp'n. at 2 ("LightSquared disclosed (and defendants knew of) its plans to launch a terrestrial
network as early as 2003"); see id. at 3 ("The potential for [out-of-band reception] . . . was
known to defendants by 2003 (when LightSquared stated its plan to launch a terrestrial
network).".)

of the facts would . . . create a duty if the jury found that Signet knew of the possibility of Reiners' fraud.").

LightSquared also alleges that Defendants had "superior knowledge" regarding the out-of-band reception issue.  Specifically, LightSquared contends that Defendants consider the operational parameters of their GPS receivers to be "proprietary and confidential," and that "[w]ithout knowing those operational parameters, it is virtually impossible for anyone but Defendants to perform any tests to Defendants' own standards that would identify a potential problem stemming from their GPS receivers."  Because Defendants did not share their proprietary information, "they remained the sole parties capable of identifying and raising the [out-of-band reception] issue."  (LS Compl. ¶ 105.)  It seems plausible that Defendants may have known that LightSquared was "acting upon the assumption that the [out-of-band reception issue] does not exist."  Bank of Montreal, 193 F.3d at 829.  LightSquared may not have entered into the 2009 Agreement to resolve only Defendants' out-of-band emissions concern if it had been aware of a separate, out-of-band reception issue that could threaten its network.[20]  Defendants appear to have had superior knowledge regarding the out-of-band reception concern, and it seems plausible that Defendants had a duty to speak regarding that issue.

LightSquared has sufficiently pled the final two elements of its negligent misrepresentation claim, namely, that "the plaintiff reasonably relied to his detriment on the false information; and the defendant[s'] conduct was the proximate cause of plaintiff's injury."  Cordoba Initiative Corp., 900 F. Supp. 2d at 49.  First, LightSquared has alleged that it "justifiably and reasonably relied on Defendants' negligent . . . omissions" by entering into

---

[20] According to LightSquared, the FCC relies upon manufacturers such as Defendants "to use receivers that reasonably discriminate against reception of signals outside their allocated spectrum."  (LS Compl. ¶ 100.)

various contracts and making substantial expenditures during 2010 and 2011 that it would not have made had it known of the out-of-band reception problem.  (LS Compl. ¶ 188.)  "Whether a plaintiff's reliance was reasonable is a question of fact that is judged based on the relationship between the parties."  Cordoba Initiative Corp., 900 F. Supp. 2d at 49–50.  Second, LightSquared has sufficiently alleged that Defendants' conduct "was the proximate cause of [LightSquared's] injury," by contending that Defendants' failure to disclose the out-of-band reception issue was "a substantial factor in bringing about" the FCC's February 15, 2012 decision to suspend LightSquared's spectrum license.  "Only in exceptional cases will questions of . . . proximate cause pass from the realm of fact to one of law."  Majeska v. District of Columbia, 812 A.2d 948, 951 (D.C. 2002).

LightSquared has satisfied the heightened pleading requirements of Rule 9(b).  As discussed above, it has identified what the alleged omissions by Defendants were and the "context of the omissions and the manner in which they misled the plaintiff."  Odyssey Re (London) Ltd., 85 F. Supp. 2d at 293.  LightSquared also describes who was responsible for the failure(s) to disclose by citing the representatives of the USGIC and Trimble who participated in the 2009 discussions and negotiations on behalf of Defendants.[21]  (LS Compl. ¶¶ 76–77.)

---

[21] Although LightSquared does not identify any representatives of Deere and Garmin as having participated in the negotiations, it has sufficiently alleged, at the motion to dismiss stage, the existence of an agency or alter ego relationship between those Defendants and the USGIC. LightSquared alleges that "Deere, Garmin, and Trimble have exercised complete control over the USGIC," that "the USGIC's expenses are paid by Deere, Garmin, and Trimble," and that "the USGIC lacks discretion to disregard the instructions of Deere, Garmin, and Trimble."  (LS Compl. ¶ 19.)  See Jefferson, 905 F. Supp. 2d at 278 (D.D.C. 2012) ("plaintiffs have pleaded a plausible claim of alter ego liability" where "the complaint [alleges] that 'Collins owns at least fifty percent of . . . B & C . . . and dominates the conduct of the company' . . . [and] that Collins acted on B & C's behalf at every stage of the real estate transaction"); Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 849 (D.C. Cir. 2000) ("The relationship of principal and agent depends . . . upon the principal 'having the right to control the conduct of the

LightSquared has also alleged "what [Defendants] obtained through the fraud." LightSquared claims that, by failing to disclose the out-of-band reception issue, Defendants "avoid[ed] incurring the expense of improv[ing] their own faulty receivers that trespass on a significant portion of LightSquared's spectrum without authorization, and [sold] hundreds of millions more GPS receivers from 2003 on, resulting in significant profits for Defendants."  (LS Compl. ¶ 154.)

The Court concludes that LightSquared has stated claims of negligent misrepresentation and constructive fraud based upon Defendants' alleged omissions of fact.

**(5)     Tortious Interference with Existing and Prospective Business Relationships**

Defendants argue that LightSquared's tortious interference claims should be dismissed because LightSquared "fails to plead facts demonstrating that each Defendant had actual knowledge of [the business] relationship[s]."  (Defs.' Mem. at 43.)  LightSquared argues that "actual knowledge" is not required to state a tortious interference claim.  (LS Opp'n. at 23.)

"To make out a prima facie case of intentional interference with business relations, the plaintiff must prove: (1) existence of a . . . business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages."  Onyeoziri v. Spivok, 44 A.3d 279, 286 (D.C. 2012) (internal quotation marks omitted).  "[A] general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability."  Bennett Enterprises, Inc. v. Domino's Pizza, Inc., 45 F.3d 493, 499 (D.C. Cir. 1995) (citation omitted).

---

agent with respect to matters entrusted to [the agent].'" (quoting Restatement (Second) of Agency § 14 (1958))).

To succeed in its tortious interference claims, LightSquared must allege facts making a "strong showing of intent to disrupt [LightSquared's] business relationships."  Id.  But LightSquared's Complaint contains no more than conclusory statements that Defendants "intentionally interfered with LightSquared's business and contractual relationships."  (LS Compl. ¶ 204.)  These allegations, without more, are insufficient to make a "plausibly strong showing of the necessary intent."  Soliman v. George Washington Univ., 658 F. Supp. 2d 98, 104 (D.D.C. 2009) (where plaintiff "no more than speculates that these comments were made with the specific intent to interfere with her employment").  Accordingly, LightSquared's tortious interference claims are dismissed.

### (6)    Civil Conspiracy

Defendants argue that LightSquared's civil conspiracy allegations "are entirely conclusory, with no details regarding who, where, or when."  (Defs.' Mem. at 44.)  LightSquared does not respond to Defendants' argument and thus concedes the point "through silence."  In re UBS AG Sec. Litig., 2012 WL 4471265, at *11.[22]

### Harbinger's Claims

### (1)    Securities Fraud and Common Law Fraud

Defendants argue that Harbinger's federal and state law fraud claims should be dismissed because "Harbinger lacks standing to assert a Rule 10b-5 claim" because "Defendants' alleged omissions affected not Defendants' own securities, but those of a different company"; Harbinger's allegations "run afoul of the heightened pleading requirements of Rule 9(b) and the

---

[22] The Court also agrees that LightSquared's civil conspiracy allegations are conclusory.  See Phillips v. Mabus, 894 F. Supp. 2d 71, 96 (D.D.C. 2012) ("Plaintiffs must plead the elements of conspiracy with particularity; bald speculation or a conclusory statement that individuals are co-conspirators is insufficient to establish a claim for conspiracy." (internal quotation marks omitted)).

Private Securities Litigation Reform Act"; and Harbinger "cannot establish . . . a duty to disclose." (Defs.' Mem. at 33, 35–38.) In response, Harbinger argues that its federal and state law fraud claims should survive because "[n]o case requires the security to be issued by defendants," and under Rule 10b-5 and New York law, "Defendants had a duty to disclose though [they were] not in privity with [Harbinger]." (Harb. Opp'n. at 8, 13.) The Court concludes that Harbinger's fraud claims should be dismissed.

For one thing, Harbinger's federal securities fraud claim must be dismissed because Harbinger lacks standing to bring a claim under Section 10(b) and Rule 10b-5. The Second Circuit's opinion in Ontario Pub. Serv. Emps. Union Pension Trust Fund v. Nortel Networks Corp., 369 F.3d 27 (2d Cir. 2004), which held that the plaintiff lacked standing because "the connection between Nortel Networks' false statements about itself and the plaintiff's purchase of JDS Uniphase stock was too remote to sustain an action under Rule 10b-5," In re NYSE Specialists Sec. Litig., 503 F.3d 89, 102 (2d Cir. 2007), appears to be directly on point.

And, because Harbinger has not alleged a "primary violation" of the Exchange Act, it has also failed to plead control person liability claim under Section 20(a) of the Exchange Act. See Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) ("In order to establish a prima facie case of liability under § 20(a), a plaintiff must show . . . a primary violation by a controlled person . . . .").

Apart from Harbinger's lack of standing under Rule 10b-5, the Court also concludes that Harbinger fails to sufficiently plead its federal and state law fraud claims, including "the time, place, speaker and . . . content of the alleged misrepresentation." Aetna Cas. & Sur. Co., 404

F.3d at 579 (citations omitted). [23]  Harbinger does not respond in its opposition to Defendants'

arguments regarding the sufficiency under Rule 9(b) of its allegations of affirmative

misrepresentations (as opposed to omissions).  (See Harb. Opp'n. at 6–12; Defs.' Mem. at 2

("LightSquared's and Harbinger's various misrepresentation claims fail because no

representation is even alleged, much less pled with particularity.").)  See In re UBS AG Sec.

Litig., 2012 WL 4471265, at *11 (a plaintiff who does not respond to a point raised by a

defendant on a motion to dismiss "concedes" that point "through silence").  And, at oral

argument, Harbinger's counsel stated that "we do not claim a literal affirmative

misrepresentation."  (1/20/14 Tr. at 11:11–12.)  "Our case primarily turns on whether there's a

duty to disclose . . . ."  (Id. at 11:15–16.)

Harbinger has also failed to state a claim of federal or state law fraud on the basis of a

failure to disclose.  "When an allegation of fraud is based upon nondisclosure, there can be no

fraud absent a duty to speak."  Chiarella v.United States, 445 U.S. 222, 235 (1980).  Under New

York law, which according to Harbinger defines the "exact scope of the duty to disclose," (Harb.

Opp'n. at 7), a duty to disclose exists "when the relationship of the parties, arising out of contract

or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the

other for information."  Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (1996).  The court considers

three factors: (1) "whether the person making the representation held or appeared to hold unique

or special expertise"; (2) "whether a special relationship of trust or confidence existed between

the parties"; and (3) "whether the speaker was aware of the use to which the information would

be put and supplied it for that purpose."  Kimmell, 89 N.Y.2d at 264.

---

[23] Harbinger does not dispute that all of its fraud claims must meet the heightened pleading
standards of Rule 9(b).

As Defendants persuasively point out, "there is no allegation that [Harbinger] even communicated, much less engaged in commercial dealings, [with any Defendants] during the relevant period, 2002-2009." (Defs.' Mem. at 31.) In contrast with LightSquared, Harbinger fails to allege that it had **any** relationship with Defendants, let alone a "special relationship of trust or confidence." While Harbinger states that "Defendants reached multiple agreements with Harbinger and its predecessors between 2002 and 2009," (Harb. Compl. ¶ 91), it is clear from Harbinger's Complaint that the entity negotiating with Defendants in 2002 and 2009 was LightSquared's predecessor SkyTerra, not Harbinger.[24] (See Harb. Compl. ¶ 109 ("In response to the OOBE objections, SkyTerra predecessors worked directly with Defendants over many months to reach a solution."); id. ¶ 153 ("Upon hearing Defendants' 'indoor' OOBE objections, SkyTerra at once set to work mediating a solution through private negotiations . . . .").) See Newbro v. Freed, 409 F. Supp. 2d 386, 401 (S.D.N.Y. 2006) ("Here plaintiff and defendants had no relationship with each other at all. Rather, plaintiff had his relationship with [another party].")

Even assuming, arguendo, that Harbinger had sufficiently alleged a "special relationship of trust or confidence," see Kimmell, 89 N.Y.2d at 264. Harbinger's fraud claims likely would be dismissed because Harbinger fails plausibly to allege that Defendants "[were] aware of the use to which the information [they provided] would be put [by Harbinger] and supplied it for that

---

[24] LightSquared alleges that it owns the licenses and interests of predecessor companies, which include SkyTerra Communications, Inc.; SkyTerra Subsidiary, LLC; SkyTerra LP; Motient Services, Inc.; and Mobile Satellite Ventures LP and Defendants do not dispute this. (See LS Compl. at 4 n.1; Harb. Compl. ¶ 60; Defs.' Reply. at 11 ("LightSquared—which at least was in privity with MSV and SkyTerra apparently does not believe that its predecessors-in-interest enjoyed such a relationship with any Defendant.").)

purpose."  Id.  That is, Harbinger does not allege that Defendants supplied any information for the purpose of inducing Harbinger to invest in LightSquared.  Id.

> **(2)    Section 349 of the New York General Business Law**

Harbinger claims that Defendants violated of Section 349(a) of the New York General Business Law which prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York state, N.Y. Gen. Bus. Law § 349(a), by "engag[ing] in materially misleading consumer-oriented conduct that directly affected New York consumers at large."  (Harb. Compl. ¶ 259.)  Defendants counter that "section 349 does not apply to securities transactions."  (Defs.' Mem. at 41.)

Harbinger's claim under Section 349 fails because it is based upon Harbinger's acquisition of LightSquared securities and "the clear weight of authority is that claims arising out of securities transactions are not the type of consumer transactions for which General Business Law § 349 was intended to provide a remedy."  Gray v. Seaboard Sec., Inc., 14 A.D.3d 852, 853 (3d Dep't 2005); see also In re Tremont Sec. Law, State Law, and Ins. Litig., No. 08 Civ. 11117, 2013 WL 5393885, at *10 (S.D.N.Y. Sept. 26, 2013) ("[S]ecurities transactions are not the type of consumer transactions for which § 349 was intended to provide a remedy."); Fesseha v. TD Waterhouse Inv. Servs., 305 A.D.2d 268 (1st Dep't 2003) ("Plaintiff's claim based on an alleged violation of General Business Law § 349 was properly dismissed since that statute is inapplicable to securities transactions."); Cyber Media Grp., Inc. v. Island Mortg. Network, Inc., 183 F. Supp. 2d 559, 581 (E.D.N.Y. 2002) ("Section 349 has not been held by courts in the Second Circuit to

apply to securities fraud claims.").  Accordingly, Harbinger's claim under Section 349 is dismissed.[25]

### (3)    Equitable Estoppel

Defendants argue that "Harbinger's equitable estoppel claim . . . fails because there is no such cause of action in Virginia or New York."  (Defs.' Mem. at 22.)  Harbinger counters that equitable estoppel "can form the basis of a claim, or it can serve as a defense."  (Harb. Opp'n. at 17.)

Harbinger's Complaint does not include any specific factual allegations supporting equitable estoppel, but, instead, "incorporates and re-alleges all paragraphs [in the Complaint]" and that "Harbinger has suffered unconscionable injury due to Defendants' deception."  (Harb. Compl. ¶¶ 249–50.)  These general allegations are plainly insufficient.  See Brandon v. City of New York, 705 F. Supp. 2d 261, 268–69 (S.D.N.Y. 2010) ("[G]eneral allegations [in the Complaint], without supporting facts other than a clause incorporating an entire complaint by reference, are insufficient to withstand even a motion to dismiss because they do not give fair notice of what the claim is and the grounds upon which it rests." (internal quotation marks and citations omitted)).  Moreover, "New York courts have consistently held that the doctrine of equitable estoppel cannot be invoked to create a right where one does not otherwise exist." Randolph Equities, LLC v. Carbon Capital, Inc., 648 F. Supp. 2d 507, 524 (S.D.N.Y. 2009)

---

[25] Harbinger cites two New York State Appellate Division cases, arguing that claims based upon securities transactions may fall under Section 349.  See Scalp & Blade, Inc. v. Advest, Inc., 281 A.D.2d 882 (4th Dep't 2001); B.S.L. One Owners Corp. v. Key Int'l Mfg., Inc., 225 A.2d 643 (2d Dep't 1996).  These holdings have been rejected by several federal and state courts in New York, see e.g., Gray, 14 A.D.3d 852, and "[t]he apparent weight of authority and the current trend appear to be that § 349 claims are unavailable for securities-related transactions, like the one at issue here."  Prickett v. New York Life Ins. Co., 896 F. Supp. 2d 236, 253 (S.D.N.Y. 2012).

(internal quotation marks and citations omitted).  Because, as noted, Harbinger fails to state a

claim with respect to its other causes of action, equitable estoppel is not available.[26]

**Noerr-Pennington and FCA Preemption**

As to the sole remaining claims, i.e., LightSquared's claims of negligent

misrepresentation and constructive fraud, the Court concludes that neither the Noerr-Pennington

doctrine nor FCA preemption applies.

LightSquared's (remaining) claims are based upon Defendants' alleged failure to disclose

material facts to LightSquared.  The Noerr-Pennington doctrine, which "bar[s] liability . . . for

statements made in the course of petitioning the government," Tuosto v. Philip Morris USA Inc.,

No. 05 Civ. 9384, 2007 WL 2398507, at *5 (S.D.N.Y. Aug. 21, 2007), is inapplicable to claims

based upon a failure to speak in private negotiations.  Noerr-Pennington immunizes "conduct

aimed at persuading the government of a position." In re Buspirone Patent Litig., 185 F. Supp.

2d 363, 370 (S.D.N.Y. 2002).

Defendants' FCA preemption argument also fails.  Defendants argue that Section

332(c)(3)(A) of the FCA preempts state-law claims that "would require a court to engage in an

assessment or reexamination of the FCC's regulatory determination regarding a mobile service's

entry into the market."  (Defs.' Mem. at 22 (quoting Telesaurus VPC, LLC v. Power, 623 F.3d

998, 1008 (9th Cir. 2010)).  LightSquared's negligent misrepresentation and constructive fraud

claims do not require reexamination of any FCC determinations regarding LightSquared's

network.  LightSquared seeks damages based upon Defendants' "statements, representations, and

omissions made to LightSquared during private negotiations about private issues."  (LS Opp'n.

---

[26] The Court need not address Defendants' statute of limitations defense.  Dattner, 2003 WL
1740448, at *6 ("Because the Court finds that this case should be dismissed on [other] grounds,
it need not address Defendants' statute of limitations claims . . . .").

at 6.)  The FCC has concluded "that Section 332 does not generally preempt the award of

monetary damages by state courts based on state . . . tort . . . claims." In re Wireless Consumers

Alliance, Inc., 15 F.C.C.R. 17021, 17022 (2000); see also Shroyer v. New Cingular Wireless

Servs., Inc., 622 F.3d 1035, 1041 (9th Cir. 2010) (fraud claim not preempted).

## V.   CONCLUSION AND ORDER

For the reasons stated herein, Defendants' joint motion to dismiss [#49] is hereby denied

with respect to LightSquared's negligent misrepresentation and constructive fraud claims, and

granted with respect to all other claims asserted by Harbinger and LightSquared.

Harbinger's Complaint is dismissed with prejudice.[27]

The parties in the LightSquared action are requested to appear for a status/settlement

conference on March 2, 2015 at 11:00.  They are requested to engage in good faith settlement

negotiations before the conference.


Dated: New York, New York
       February 5, 2015

                                              RICHARD M. BERMAN, U.S.D.J.


---

[27] During a March 3, 2014 conference, the Court gave Plaintiffs the opportunity to amend their
Complaints in light of the anticipated motion to dismiss arguments presented by Defendants and
also informed Plaintiffs' counsel that Defendants' motion would, if successful, be "with
prejudice and there would be no further amendment, since having heard about the alleged defects
in the complaint, the plaintiff is given the opportunity to amend." (Hr'g Tr., dated March 3,
2014 at 4:10–13.)